FRANK L. REARDEN, Administrator Estate of HELEN M. QUIN, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

Division Two, December 15, 1908.

1. NEGLIGENCE: Passenger on Railroad: Dangerous Alighting Place: Contributory Negligence. It is the duty of a railroad company to provide suitable and convenient means for passengers to alight in safety from its trains at the place of their destination. Where the train did not stop at the platform, but passengers were compelled to alight on the ground; the station had been called and the train stopped; the ground had been excavated by the company in double-tracking its road, and as a result the tracks were rough and uneven, and the distance from the steps to the ground was, because of the piles of cinders which had not been spread out, a foot in some places and six feet in others; the night was dark, and there were no lights, and no warning; the passenger occupied a seat three or four seats from the front door, and that door was not locked and no direction was given passengers when the station was announced

to go out at the back door; the front door was the usual exit; no porter or brakeman was present to assist the passenger to alight or to warn her that the landing was dangerous; she testified that she expected to find a trainman there to help her alight, but finding none and fearing she might be carried on to the next station, she thought she could get off in safety by herself, and by reason of the great distance to the ground, which she could not measure in the darkness, she fell, and was injured; and the conductor testified he was at the front door of the car with his lantern—it will not be held that she was guilty of such contributory negligence as bars a recovery for that she voluntarily chose a dangerous way when a safe one was open to her. If the conductor was at the door of the car she came out of, it was his duty to have warned her of the danger of alighting there and directed her to go to the other door; if he was not there, it was defendant's duty to have someone there to warn her of the danger, or at least to have had the door locked.

2. ————: ————: ————: ————: **Notice.** And where plaintiff testified that when she went to the station in the morning to take a train, she did not notice the uneven condition of the ground and had no occasion to do so, the fact that she remained there then seven minutes waiting for her train is not conclusive or even evidence that she had knowledge of the dangerous condition of the grounds.

3. ————: ————: ————: **Instruction: Utmost Care.** The railroad company is required to exercise the highest degree of care in providing a safe place for passengers to alight from its trains. The relation of passenger exists during the period needed for a safe exit from the train. The degree of care to be exercised by the carrier for a passenger's safety while he is leaving the car is as high as that the carrier is required to exercise for the passenger's safety while the passenger is in transit. Where the station is announced by the train men and the train stops at an unusual place, and the landing place is dangerous, and the passenger is injured in the very act of getting off, and that injury is due to the rough and uneven grounds and the great distance from the steps to the ground, defendant is not excusable if it exercised only ordinary care, but it must exercise the highest degree of care. And in this case, plaintiff's instructions did not put the emphasis upon the platform and surrounding grounds, but upon the dangerous exit.

4. ————: **Evidence: Specific Injuries: Objective Symptoms.** Where the allegations of injuries were specific, but there was none of injuries to plaintiff's leg, it was not error to permit her to testify that her leg was giving out completely, if the

petition charged that her entire nervous system was shocked and impaired by the injury, and the experts testified that an objective symptom of injuries to her nervous system and spine was the impaired use of her leg. She could not testify to injuries to the leg, but as the weakness of the leg was traceable to the injury to the nervous system, she could testify as to its impaired condition at the time of the trial.

5. ————: ————: Condition of Health: Expert. A witness, though not an expert, who has lived in the house of plaintiff for a year or longer, with daily opportunity to see her, is competent to state her condition of apparent health. It is not improper for such witness to say that plaintiff's physical condition was very poor.

6. ————: Instruction: Contributory. Where every element of contributory negligence applicable to the case is included in instructions given, it is not error to refuse another instruction asked by defendant which attempts to set out with more detail what acts on plaintiff's part would constitute contributory negligence, and includes therein certain acts upon which there was no evidence.

7. ————: ————: ————: Knowledge: No Evidence. An instruction which seeks to defeat plaintiff's recovery on grounds to support which there is no evidence, should be refused. Where there was no evidence that plaintiff saw on the morning preceding her injury the condition of the rough and uneven ground upon which she alighted in stepping off the train that evening in the dark, or that she knew that evening in the darkness that the train had stopped in an unsafe place for her to alight, the jury ought not to be told that such knowledge would defeat her recovery for injuries received in stepping off of the train down into a deep excavation at an unusual stopping place.

8. ————: ————: Equal to Demurrer: No Light or Trainman. Where whether plaintiff amid all the circumstances surrounding her exercised ordinary care in alighting from the train was a question for the jury, the court should refuse an instruction which in effect amounts to a demurrer to the evidence and bars her recovery on the ground of contributory negligence. The instruction told the jury that if the passenger went out of the car at the front end, and when she opened the front door found the place was dark and no brakeman present to assist her in alighting, and in attempting to alight was injured, and such injury would not have occurred if the place had been lighted and there had been a brakeman present to assist her, she could not recover. Held, not to be the law, and properly refused. Not knowing that the place was dangerous, and not being able to see and having been invited by the announcement

of the station and the stopping of the train to alight there, she had the right to presume that, with the exercise of ordinary care, she could alight in safety.

9. ————: **Simulated Injuries.** Where there was sufficient evidence, if believed by the jury, to justify a finding that plaintiff was seriously injured, the contention that she was not injured but was simulating will not be sustained on appeal.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher*, Judge.

AFFIRMED.

*W. F. Evans, J. G. Egan* and *E. T. Miller* for appellant.

(1) Plaintiff was negligent and her negligence should have barred a recovery. Eckerd v. Railroad, 70 Iowa 353; Railroad v. Dingman, 1 Ill. App. 162; Plant v. Railroad, 21 Law Times Rep. 836; Railroad v. Ricketts, 96 Ky. 44; Reed v. Axtell, 84 Va. 231; Railroad v. Keith, 22 Ky. L. R. 593, 58 S. W. 468; Railroad v. Aldridge, 27 Ind. App. 498; Railroad v. Davidson, 64 Fed. 306; Bennett v. Railroad, 57 Conn. 422; Sargent v. Railroad, 114 Mo. 356. (2) Defendant was required to exercise only ordinary care as to its platform and station grounds. Robertson v. Railroad, 152 Mo. 388; Kelly v. Railroad, 112 N. Y. 443; Laflin v. Railroad, 106 N. Y. 139; Hiatt v. Railroad, 96 Iowa 169; Waller v. Railroad, 59 Mo. App. 410; Moreland v. Railroad, 141 Mass. 31; Johnson v. Railroad, 52 Hun 111; Rigg v. Railroad, 12 Jurist (N. S.), Part I, 525; Taylor v. Penn. Co., 50 Fed. 755; Penn. Co. v. Marion, 104 Ind. 239; Falls v. Railroad, 97 Cal. 114; Stokes v. Railroad, 107 N. C. 178; Race v. Union Ferry Co., 138 N. Y. 644; Glenn v. Railroad, 73 N. E. 861; Thompson on Carriers, pp. 104, 105; 4 Elliott on Railroads, sec. 1590; 2 Hutchinson on Carriers (3 Ed.), sec. 941; Ray on Negligence of Imposed Duties—Passenger Carriers, pp. 94, 96, 97; 2 Shearman &

Redfield on Negligence (5 Ed.), sec. 501. (3) Where the petition alleges specific injuries, evidence of other injuries should not be permitted to be introduced. Slaughter v. Railroad, 116 Mo. 275; Arnold v. City of Maryville, 110 Mo. App. 259. (4) Although no objection was made to the question concerning the injury to plaintiff's leg, the motion to strike out her testimony on this point properly saved the question. Barr v. Kansas City, 121 Mo. 29. (5) A specific instruction that plaintiff was negligent, covering facts which can be found from the evidence showing the plaintiff was negligent, should be given to the jury. Van Horn v. Railroad, 198 Mo. 494; Hartman v. Railroad, 112 Mo. App. 446. (6) The opinion of a non-expert witness concerning the health of another should not be admitted in evidence. Railroad v. Christian, 124 Pa. St. 114; Boies v. McAlester, 12 Me. 308; Thompson v. Bertrand, 23 Ark. 730; Bell v. Morrisett, 51 N. C. 178; State v. David, 131 Mo. 395. (7) The opinion of a non-expert witness that another suffers or will suffer from a specific disease is incompetent. U. B. Mutual Aid Society v. O'Hara, 120 Pa. St. 256. (8) Even a physician who has examined a patient is not allowed to give an opinion concerning the condition of the plaintiff's health without first detailing the facts discovered by the examination. Reid v. Ins. Co., 58 Mo. 425.

*Geo. D. Reynolds* and *Geo. V. Reynolds* for respondent.

(1) When the defendant by his own negligence or wrongful acts or omissions throws plaintiff off his guard, or when the plaintiff acts in a given instance upon a reasonable supposition of safety induced by the defendant when there is in reality danger to which plaintiff is exposing himself in a way and to an extent which, but for the defendant's inducement, might be

imputed to the plaintiff as negligence sufficient to prevent a recovery, such conduct on the part of plaintiff, so induced, will not constitute contributory negligence in law and the defendant will not be heard to say that the plaintiff's conduct under such circumstances is negligence for the purpose of a defense to the action. Beach on Contributory Negligence, p. 173, and sec. 23, p. 71; McGee v. Railroad, 92 Mo. 208; Leslie v. Railroad, 88 Mo. 50; Railroad v. Buck's Admrs., 96 Ind. 347; Eichorn v. Railroad, 130 Mo. 587; Fillingham v. Railroad, 102 Mo. App. 573; Talbot v. Railroad, 72 Mo. App. 291. (2) The contract between a carrier and a passenger continues not only during the interval of time consumed in transporting the passenger from his starting point to destination, but during the period needed for a safe exit from the vehicle, and includes the providing of a safe landing place for the passenger. Hutchinson on Carriers (2 Ed.), sec. 612; Kelly v. Railroad, 70 Mo. 604; Straus v. Railroad, 75 Mo. 185; Hart v. Railroad, 94 Mo. 255; McKimble v. Railroad, 139 Mass. 542; Railroad v. McCaffrey, 173 Ill. 169; Fillingham v. Railroad, 102 Mo. App. 573. (3) The carrier is bound to exercise care in securing the safety of the passenger while boarding and alighting from its cars or other conveyances, and the degree of care required in the discharge of this duty is the highest care or the care which a very prudent person would have used under the circumstances. That is, that high degree of care which is required with reference to the transportation of passengers. 6 Am. & Eng. Ency. Law and Procedure, 611; Weber v. Railroad, 100 Mo. 194; Grace v. Railroad, 156 Mo. 295; Kelly v. Railroad, 70 Mo. 604; Atkinson v. Railroad, 90 Mo. App. 489; Fillingham v. Railroad, 102 Mo. App. 582. (4) The rule above is to be distinguished from the one holding a carrier only for lack of ordinary diligence in respect to platforms or approaches, in actions for injuries re-

sulting before the relation of carrier and passenger began and after it ended. Cobb v. Railroad, 149 Mo. 150; Kelly v. Railroad, 112 N. Y. 443; Fillingham v. Railroad, 102 Mo. App. 473. (5) A witness may state the apparent physical condition of a man as the existence of the state of apparent health or on the other hand the existence of apparent sickness. State v. Harris, 150 Mo. 56; 17 Am. & Eng. Ency. Law and Procedure, 87. (6) A variance between the pleadings and the proof as to the nature of the injury, if not substantial, will not prevent a recovery. 29 Am. & Eng. Ency. Law and Procedure, 589; Smiley v. Railroad, 160 Mo. 637; Railroad v. Cuinely, 26 Ill. App. 173. (7) Where a party makes no objection to the admission of testimony, it is too late afterwards to move its exclusion. Roe v. Bank of Versailles, 167 Mo. 406; State v. Forsha, 190 Mo. 326. (8) Evidence of bodily injuries received by a plaintiff in a wreck resulting from defendant's negligence is admissible under a general averment of injury to the body. Wilbur v. Railroad, 110 Mo. App. 693.

GANTT, J.—This action was begun by Mrs. Helen M. Quin in the circuit court of the city of St. Louis in 1905. She recovered judgment and the defendant appealed to this court. On July 14, 1908, the death of Mrs. Quin was suggested in this court and regular steps were taken and the cause was revived in the name of Mr. Rearden as her administrator.

The plaintiff in substance stated that the defendant was a railroad corporation and a common carrier of passengers in the State of Missouri; that on the 20th of November, 1903, she became a passenger upon the defendant's road, having purchased a ticket entitling her to a first class passage on defendant's road from St. Louis to a station called Lindenwood; that on arriving at said Lindenwood, defendant did not stop

its train at a stopping place where it was safe for plaintiff to alight, but on the contrary at a place where it was unsafe and dangerous; that before reaching said stopping place Lindenwood was announced by the defendant's servants and agents in charge of said train, thereby inviting the plaintiff to get off when and where the train should stop; that the night was dark, and plaintiff could not for that reason see the danger; there was no light at the end of the car at which plaintiff attempted to alight, and none of defendant's servants present who could or might have seen and warned plaintiff of the dangerous surroundings; plaintiff in attempting to alight, in the usual manner and by the usual means ordinarily employed by passengers on defendant's train, fell by reason of the fact that there was no safe place or platform upon which plaintiff might alight, and which plaintiff had the right to assume was there; the ground between the track and the station was being excavated, was rough and an unsafe place upon which to alight and the distance to the ground was greater than the distance to the platform ordinarily used by the defendant at its said station by reason of the fact that the defendant was lowering its tracks and had run the train upon which plaintiff was injured into said Lindenwood Station over a temporary track. Plaintiff in attempting to alight stepped down expecting to alight upon a platform, and there not being one there, she was precipitated with great force to the ground, being thrown suddenly and violently into the excavated ground alongside of the track; that by said fall plaintiff was severely and permanently injured in this, to-wit: her left side was hurt, wrenched and strained; her right arm hurt; the back of her head hurt; her neck and spine strained, hurt and wrenched; and her nervous system greatly shocked and permanently injured. She averred that she had suffered great pain and mental anguish and would

Rearden v. Railroad.

continue to suffer the same in the future; that for four months plaintiff was confined to her bed, and that she has never since the date of the accident, and is not now able to attend to her household duties, which she always was able to and had done before then. The petition then alleges that said injuries were caused by the negligence of the defendant and its agents and servants in not providing a platform or safe place for plaintiff, a passenger, to alight upon, and by the negligence of the defendant, its agents and servants in running its train over a temporary track and stopping it in an unsafe place, and by the negligence of the defendant, its servants and agents in allowing the ground adjacent to the track and at the place where the plaintiff was compelled to alight to remain in an unsafe condition; and by the negligence of the defendant, its servants and agents in not providing lights, which would have enabled plaintiff to see in getting off of defendant's train; and by the negligence of the defendant, its agents and servants in not being present at that part of defendant's train from which plaintiff alighted to enable plaintiff to alight. It was further averred that the unsafe condition of the place where defendant stopped its westbound train, as aforesaid, at the station, by the exercise of ordinary care and diligence could have been known by defendant, its agents and servants in time to have made it safe for plaintiff and other passengers to alight, and was then known to defendants, its agents and servants. Plaintiff alleged that she was damaged in the sum of $20,000, for which she prays judgment.

The amended answer by leave of the court was filed during the progress of the trial on October 27 1905, and consisted, first, of a general denial of the allegations of plaintiff's petition, and, secondly, that

215 Sup—8

if the plaintiff was injured at the time charged in her petition, such injuries were not caused by any negligence of the defendant, but were caused by the negligence of the plaintiff in alighting from the car after she understood and knew it was dark and that there was no brakeman or other employee of the defendant present to assist her in alighting, and in her failure to exercise care in the act and in the manner of stepping from the car.

To this answer plaintiff filed a reply denying all the new matter set up in the answer.

There was a verdict and judgment for the plaintiff for $5,000. Motions for new trial and in arrest of judgment were promptly filed, heard and overruled, and an appeal was taken to this court.

The evidence discloses that Mrs. Helen Quin lived in Lindenwood, and on the morning of the 20th of November, 1903, went to St. Louis on defendant's train. Lindenwood is about seven miles southwest of the Union Station in St. Louis. That afternoon Mrs. Quin returned to Lindenwood on one of defendant's trains, which left St. Louis at 5:24, and was due at Lindenwood at 5:47, but was about eight minutes late. When she reached Lindenwood it was dark. As the train came into the station at Lindenwood, the station was announced by the defendant's conductor. Mrs. Quin was sitting in the fourth or fifth seat from the front door on the west end of the coach; when the train stopped she got up and went out of that door which was closest to her. When she reached the platform of the car, it was dark, there were no lights and she proceeded to get off of the car, and took hold with her right hand of the rail to get down. As she got to the last or lowest step, the distance was so great to the ground that in stepping off she did not reach a solid foundation and her right arm was wrenched loose and she was thrown over and struck on the back

of her head, her head going under the steps. There
was no brakeman, conductor or other employee there
to assist her in getting down or to direct her. After
falling she crawled out from under the car. When
she fell she went down on her shoulder and the back
of her neck struck some hard substance, and her feet
went into a hole and threw her on her side. She
crawled to the station and with the assistance of her
husband managed to walk to her home some two blocks
away from the station. On the way home, she was
compelled to stop several times. At the time of the
accident she was wearing furs around her neck and had
on a heavy wrap, her fur collar was turned up against
her neck. The next morning she found that the hair
pins in her hair were bent like hooks. The next morn-
ing Dr. Hill was called in to see her and continued
to wait on her for over two months. She was con-
fined to her bed from the 20th of November until
March; during that time she was suffering from pains
in the back of her head and shoulder and spine. She
testified that her spine was badly hurt and that she
suffered greatly with her shoulder and the back of
her head. That she was losing the use of her right
arm from her shoulder down. She had no use of her
hand and could not hold anything in it and could not
dress herself and could not turn her arm around to
fasten her clothes; that her left arm was giving out
completely; that she had several falls trying to walk
about since her injury; she was unable to walk without
assistance and she could not sleep, but had to sit up
half the night propped up with comforts and pillows,
and that if she did lie down she had to lie on her left
side, the pain was so great in her back and side. She
testified that prior to this accident or injury she was
able to do all of her household duties and took care
of a six-room house and did her own cooking and
other work; since that time she has been unable to do

Rearden v. Railroad.

anything. She had not been taken out of the house for eleven months after the accident until she was brought to the court. On cross-examination, she testified that before the accident she had not been out of the house for three months; that on the morning of the day of the accident, when she came down to the station at Lindenwood, she was there a very short time, probably five or ten minutes; that the car was full of passengers that night, but she did not notice whether the other passengers went forward or backward at the time she got off; that when she got off she supposed there would be a brakeman to help her. When she went to the station in the morning she did not look at the surroundings of the station, she got on the train and that was all. She testified further that she had no warning or information that she should leave the train at any particular point of it. She supposed there would be a brakeman there to help her off, and alight, but there was none. She said the reason she did not go back when she discovered it was dark was that she thought that she did not have time and she was afraid the train would start before she would get out at the other end and she would be carried to the next station. She did not know it was dangerous to get off at that door or that end of the car. She held on to the railing to steady herself; she did not realize that it was dangerous.

Mrs. Lindburg went on the train with plaintiff from Lindenwood to St. Louis the morning of the day the plaintiff was injured. They occupied the same seat. She remembered hearing the plaintiff met with an accident that day. She did not see her for some time, some two or three months after that; during that time she lived on the adjoining lot to the plaintiff.

Mrs. Nellie Linsey, the sister-in-law of the plaintiff, who had known her for twenty-one years, and had seen her frequently during all that time, testified that

the plaintiff came to visit her on the 20th of November, and left her house about three o'clock that afternoon to go to the station to return to Lindenwood. Prior to that date the plaintiff's health was good and she was strong, she performed all her household duties and did her own cooking. She had seen the plaintiff frequently since the night of her injury and had observed her physical condition. She had been sick most of the time and Mrs. Quin's husband and son performed the household duties. Plaintiff either sat in a chair or lay down; she was confined to her bed for three months after the accident.

Dr. R. S. Hill testified that he was a physician, a graduate of the Homeopathic Medical College of Missouri, and had known the plaintiff since 1902; he was called to treat her professionally on the morning of November 21, 1903. Her husband asked him to call. He went to their house and found the plaintiff in bed, complaining of a severe headache, great pain in her back between the shoulder blades, and said that the pain would start there and shoot clear through her body, also had severe pains in her left knee and right shoulder. He was told the history of the case as above detailed and he examined her carefully. He found no outward bruises or abrasions, the symptoms being all subjective, that is, a symptom given by the patient of her feelings. She had a very low, soft pulse, which indicated a considerable shock. He administered anodynes and opiates, and changed a number of times, the pains were exceedingly stubborn, and did not yield to his treatment. He then applied liniments and outward applications, but for a long time without success. He worked on the case for probably two months, then afterwards visited her at longer periods. He continued to prescribe for her after that. He testified that an abnormal pulse could not well be simulated. A hypothetical question covering the ma-

terial facts as to how the injury occurred was propounded to him and he was asked if a fall of that character would probably induce the injuries of which she complained, and he answered that in his opinion such an injury would produce those symptoms. He testified he had examined the plaintiff about two weeks before the trial, found her in a weakened condition, with a low condition of the sympathetic nervous system, and complaining of pains similar to those that she had complained of before when she was first hurt. He found her complaining from sensitiveness in the spine between the shoulder blades, from sleeplessness and the loss of the use of the right arm. He had known the plaintiff before the alleged accident or injury, and she seemed to be in moderate good health, going about her house, doing her household duties so far as he knew. On cross-examination, he stated that he treated her about two months after the injury, but not continuously that long; he went regularly for about two weeks. He was asked if he had been able to come to any conclusion why his treatment did not relieve her and he answered that he reached the opinion that there must be something internal the matter. He could not find any external injuries upon her body.

Frank Murphy and Mr. Isaac Brown, both of whom were in business in St. Louis but lived at Lindenwood, testified to having occasion to use defendant's railroad from Lindenwood to St. Louis for a number of years. They were familiar with the condition of defendant's station and tracks throughout the month of November, 1903. On the 20th of November there were three tracks at this station. The company was retracking its station and relaying its tracks, excavating the natural soil and putting in cinders and changing the tracks. The evidence was that at that date there were piles of cinders and gravel that had been thrown out by the construction men, waiting for the

men to put them in shape.    The tracks were very
rough and the platform had been removed.    The sur-
face of the ground in and around the tracks was very
uneven.    The distance from the steps to the ground
was a foot in some places, and in others six feet; at
some places there would be piles of cinders and gravel,
which would almost touch the steps.    Mr. Gruner testi-
fied to practically the same effect, saying that there
were holes probably four feet from the ground up to
the first car steps at places in the said station.    It was
in a torn-up condition practically for a month in No-
vember.

Other witnesses testified to the general good
health of the plaintiff prior to her injury and to her
inability to do anything about her household duties
after her injury, and the fact that she was confined to
her house and bed after she was hurt.

Two physicians, Dr. Farrell and Dr. William M.
Hoge, testified as experts in the case.    Dr. Farrell
was a graduate of Washington University Medical De-
partment and was in the clinic in the University Hos-
pital.    He was surgeon of the First Regiment and ac-
quainted with the plaintiff. He examined and diagnosed
plaintiff's case some five weeks before the trial, mak-
ing a thorough examination and subsequently assisted
Dr. Hoge.    He found certain paralytic conditions,
namely, her inability to raise her arm above a certain
point; her inability to raise her arm to the head above
a right angle; difficulty in walking; apparently little
use of the left arm; want of sensitiveness in certain
muscles, on the application of a sharp instrument she
could not tell whether it was the point or the head of
a pin, and she could not feel it when stuck in her.
He tested the whole of her body.    He thought this
condition was permanent.

Dr. Hoge, a physician of twenty-two years prac-
tice, a graduate of the St. Louis Medical College and

connected with the Medical Department of Washington University as Chief of the Clinic for Nervous Diseases and a specialist in this department, examined the plaintiff on the 20th of October, 1905, about a week before the trial.   His examination was principally in reference to the nervous condition, as to the presence of any functional or organic disease of that system.   There were certain disturbances which he found and· considered objective from the fact that they could hardly be simulated, even if the patient' should have been so disposed; that is to say, one area, anaesthesia covered exactly half of the body; it extended exactly to the median·line over the head, face and trunk, before and behind, and· unless the patient had been very well posted before she could hardly have simulated that, even if she had desired to do so.   And then he found a weakness in the hand, right hand and arm, and in both legs, the reflexes in both legs were increased; there was also a reflex found in the left foot, an extension of the toes on irritating the sole of the foot, which is considered to be a positive sign of an organic lesion on the spinal cord.   He testified that if this examination was properly made this condition could hardly be simulated.   He also testified that he found incontinence of urine, and he consider ed this an objective test from the observation which he had made.   He testified that these symptoms or the condition which was indicated by the objective symptoms were in all probability permanent and almost certainly so after this length of time.   A hypothetical question was propounded to this doctor based upon the age of the plaintiff and the assumption that when she stepped off of the steps she fell and her right hand was wrested from the handrail and the back of her head hit the step or some other hard substance and that prior to that time she had been able to sleep well and perform her household duties, and her power of

locomotion was unaffected, whether or not that character of an injury, although there were no external abrasions, would probably result in the condition in which he found plaintiff, and he answered that .that would depend, and being directed by the court to answer yes or no, said that every question could not be answered by yes or no. The court then stated to him that the question was whether this condition would probably result from such an injury, and he answered that he would say yes in the sense that that degree of injury very often results from that degree of shock, but he could not state the exact chances in favor of or against. He was then asked to explain what he meant by the reflexes and he answered that it was a muscular contraction with a corresponding motion of the limb, which results from putting a tendon on a stretch by a sudden stroke, as, for instance, tapping the knee causes the foot to fly out; the sudden tension put on the tendon puts the muscle on the stretch and causes a sudden contraction; the same may be brought about by irritating the skin in certain areas, for instance, tickling the sole of the foot produces an involuntary muscular tension and this will occur without the intervention of the will or conscience. They may occur in unconscious persons as well as conscious, provided the conditions are suitable, and their occurrence or failure are indications that vary with the conditions of the nervous system.

There was other evidence as to the condition of the station grounds practically to the same effect as already detailed by the other witnesses.

On the part of the defendant August Oberfelt, a civil engineer, in the employment of the defendant, testified from a profile map showing the changes that had been made in the defendant's station yard at Lindenwood in 1903. He did not make the survey himself and was not employed in making the changes at

Lindenwood in 1903.     According to his testimony the change in the grade going east from the station three hundred feet amounted to a foot and two and three-fourths inches and there was no change made going west from the depot.     On cross-examination he testified he passed over this ground while the work was being done frequently, about two or three times a week, and that the company lowered the grade of the old track and double-tracked it, they excavated the earth and moved it with a steam shovel.     The track going into St. Louis was next to the station, and the track coming out from St. Louis was put down after the grade had been established.     A temporary track was put in while the work of excavation was being done.

J. W. Withington testified that he was a conductor on the defendant's train that left St. Louis at 5:24 on the afternoon of November 20th, 1903; that it was his duty to be between the smoker and the first ladies' coach.     The out-bound trains used the track to the north and there was no platform at Lindenwood and the station ground was usually filled up with cinders. He testified that the train that night consisted of five cars, a baggage car and four coaches.     The baggage car was next to the engine and the smoker next to the baggage and the other three coaches were for passengers, ladies and gentlemen.     These cars were lighted before they left the station in St. Louis with what is known as pinch gas lamps.     There were four lamps in a car up in the ventilator.     These cars had large windows.     He testified that when they got to Lindenwood, his station was between the smoker and the first ladies' car discharging and taking up passengers. He had his conductor's lantern with him, there was a brakeman and a porter who worked back in the next two cars.     There were five places on that train where people could get off and there were only three em-

ployees to attend to them.     He testified that he had no remembrance of Mrs. Quin getting off of the train that night or of her falling down or being injured in any way; did not learn it until the latter part of the next February.     He testified that in the change of the station grounds, the track was left pretty near on the same grade that it had always been.     There was a platform there but it was used only on the in-bound trains and the out-bound trains took the north track and there was no platform to that.     On cross-examination, he said suburban conductors like himself really performed the duties of porters in the discharge and receipt of passengers at the several stations, that is, they assist ladies and children, old and feeble people on and off the trains.     That his duty was to get down on the ground and assist them in alighting.     He could not state whether on that particular night the porter was between the third or fourth coach.     Their duties were similar to his in assisting passengers.

F. Huffsmith testified that he was brakeman on that train, but he cannot remember the condition of the ground at the station about the 20th of November. His duty was to help passengers on and off the train when it stopped.     He remembered that they had cinders put in at Lindenwood and that the distance from the step of the train to the ground, when they were lowering the tracks, was greater than at other times, he could not say how much.

George Daish, superintendent of construction, testified that he was double-tracking the Frisco in 1903 from Chouteau to Spring Park.     He testified that there was no platform at Lindenwood between the tracks, but that there were cinders.     The company excavated during the day and moved the track over and filled in at night.

Testimony of the defendant's witnesses was to the effect that some work had been done in the way of

shifting the tracks of the defendant opposite or near the station at Lindenwood, but as the work progressed the ground was left smooth and at the close of each day's work the ground was left smooth opposite and near the station and this work had all been completed before November 5, 1903, and after that time the ground was not disturbed.

The defendant also introduced as a witness Dr. Floyd, a surgeon of the defendant, who testified that he made a careful examination of plaintiff in December, 1903, soon after the accident, and could discover no objective symptoms of any injury, and at this time she was in bed with her clothes on, such clothes as a woman usually wears about her house, and with a cold cloth around her head and he thought had been placed around her head just before he was admitted to examine her. He testified he went to her home and was invited by her husband to come in and see her. She was in bed with a cloth tied around her head, groaning, she said she was feeling badly. I asked her how long she had been confined to her bed, and she said several days. I discovered that the cloth around her head was cold, did not have the warmth of her body. He said to her, he would like to find out all about this, and she said "certainly," and without much ado he pulled down the covers, and she was in bed with her clothes on. "I went on with the examination and could discover no objective symptoms of injury of any kind. I found her memory was good. She said she had great pain about her shoulders, but upon applying a test for pain, her condition showed me she had no pain, or it was imaginary." On cross-examination he stated that the dress that she had on was an ordinary calico dress or wrapper, and the usual underclothes; she had on no shoes. He further stated in answer to the question: "In your experience have you ever known a person to have suf-

fered a severe injury and have no outward sign of abrasions or contusions of any kind?'' that as compared·to the total number of cases, they are very rare. ''Q.    But they do occur, do they?    Ans.    It is possible, yes, sir.    Q.    Have you ever treated a person, who has been struck by a blunt instrument and whose body does not show some abrasion or contusion?    Ans. Yes, sir; I have treated them.''

I.    It is insisted by the defendant that the circuit court should have directed a nonsuit on the ground that the contributory negligence of the plaintiff barred her recovery.    This contention is predicated upon the fact that it was negligence on the part of the plaintiff to leave the car at the door through which she passed out because the other passengers went out at the other door, and that when she reached the platform of the car she found it was dark out there, and she found no conductor or other train men there to help her off, and she had no right, or at least was negligent, in attempting to pass from the car under such circumstances; that to attempt to alight from the car in the darkness was fraught with danger, even though the surface of the ground was level and a normal distance from the car steps.    In this same connection it is argued that because the plaintiff came to this same station in the morning when she went to St. Louis and was there some five or ten minutes before her train arrived for the city, it was impossible for her to have failed to observe the condition of the ground that forenoon and see that it was rough, uneven and excavated as her evidence tended to show; that her apprehension that she might not have time to go back to the other end of the car to alight did not justify her in taking the risk of alighting at this door or from this platform.    And that any accident or injury that did occur to her was the result of her own carelessness in not availing herself of a safer method of leaving

the train. It is also urged, in support of this propo-
sition, that the plaintiff had often traveled from this
station to St. Louis and knew that the regular stopping
place of this west-bound train was not at a platform,
but that the passengers got off of the train upon the
ground between the tracks.

The testimony tended to show that when the train
reached Lindenwood it was dark; that this train, which
was a suburban passenger train, usually stopped about
one minute to allow passengers to alight; that the
front door was not locked and no warning was given
passengers to go to the rear door to alight instead
of the front door; that although it was dark, plaintiff
was not advised it was dangerous to go out at that
door and leave the car. It was the duty of the de-
fendant to provide suitable, safe and convenient means
for the ingress and egress of its passengers into and
out of its trains. It stands admitted that this train
did not stop at the platform, but passengers were com-
pelled to alight on the ground. Plaintiff testified
she expected to find a brakeman or porter to assist
in alighting, but finding none and fearing that she
might be carried to the next station, thought she could
get off in safety by herself, and by reason of the great
distance to the ground, which she could not measure
in the darkness, she fell, and her hand was wrested
from the handrail. Being near the front of the car,
plaintiff says she did not notice, when she went out,
what direction other passengers were going and she
was not directed to go to the other door. By this
assignment of error, defendant seeks to avoid liability
by insisting that plaintiff was guilty of such contrib-
utory negligence as will bar her recovery because she
voluntarily adopted a dangerous way when a safe way
was open to her. But this defense is inconsistent
with the testimony of the defendant's conductor, who
testified that he was at that front door with his lan-

tern, thus making it a proper and safe way to leave the car.    If he was there and it was dangerous to alight from the front platform, it was his duty to have warned plaintiff of the danger and directed her to go the other way.    If he was not there and it was dangerous, as defendant now asserts, then the defendant was negligent in not having some one there to warn passengers or at least have had that door locked and have directed plaintiff to go to the rear platform to get off.    The claim that plaintiff was chargeable with notice of the uneven surface of the station grounds because she had gone to St. Louis that morning from its station or platform at that place and waited there five or ten minutes, is entirely inconclusive.    She testified she paid no attention to the ground and had no occasion to do so.    The defendant having provided this place for its passengers to alight and stopped its train there in the night and announced the station and not having warned plaintiff not to get off at this end of the train, she had a perfect right, in the absence of knowledge of the danger, to presume she could alight in safety.    The facts of this case distinguish it from that class of cases cited by the defendant, wherein a passenger in the daytime, with full notice of the customary and safe exit from the train, voluntarily elects to leave the train by a way known to be dangerous, and no invitation or direction given by the company or its servants to pass out that way; or a case like that of Railroad v. Dingman, 1 Ill. App. 162, in which a lady boarded a train at night and while it was raining and requested the conductor to show her off and he promised to do so, at her destination.    When the train reached the station, the conductor came in, and announced the station.    Instead of going to the front door where the conductor stood with his lantern and was ready to assist her and was helping other passengers off, she went to a rear door and stepp-

ed off in the dark and fell into a culvert.  In that case
the court held that unquestionably it was the duty of
the railway companies to provide for their passengers
suitable, safe and convenient places for landing from
their cars, and to furnish reasonable facilities for
alighting with safety, but it was also the duty of pas-
sengers to exercise due care to avoid injury, and where
a proper landing place is provided and the *passenger
knows* or has means of ascertaining its locality, he
should make his exit at the place so provided, and if
he unnecessarily and negligently exposes himself to
danger and is injured, the injury is the result of his
own act.  In this case the testimony of the conductor
was that this front exit was one of the usual places
of exit and that this was the usual place to assist pas-
sengers off.  Certainly the plaintiff was not guilty of
negligence in going to that door under defendant's own
showing.  While the jury found the conductor was
not there that night and he could only state that he
was, because such had been his uniform custom, he
might have been elsewhere on other duty, but this
would not change the fact that the door out of which
plaintiff left the car was a usual exit, and in adopting
that way she could not be charged with leaving the
train at a known dangerous and unusual way, or that
she knew the uneven surface of the station grounds.
The facts of this case bring it within the principle
announced in Eichorn v. Railroad, 130 Mo. 575.  In
that case, as in this, the defendant sought to escape
liability on the ground that the plaintiff was negligent
in attempting to board the train from the east side
instead of the west, and asserted that it was its custom
to place its servants upon the west side to assist pas-
sengers in getting on and off the trains, but the evi-
dence did not sustain that claim.  It was shown that
passengers got off and on on either side and there was
nothing to indicate any more preparation to receive and

assist passengers on or off of the train on the west side than there was on the east. In this case, the appearances did not indicate that it was any safer for the plaintiff to have gone out of the rear door instead of the front door, save and except that it turned out on this particular occasion there was no one at the front door to assist her in alighting, and the evidence tended to show that other passengers did alight from the rear end, but as already said, there was no platform for any of the passengers to disembark upon, and according to the defendant's own evidence the same preparation was made for passengers to alight upon the ground at the front end as there was at the rear end, and plaintiff, having gone to the front and without any warning to go to the rear and without any knowledge that it would be dangerous to get off at this place, we think, cannot be charged with such contributory negligence as will bar her recovery. As was said in Eichorn v. Railroad, supra, "Carriers of passengers should anticipate that both old and young women, feeble and delicate people, as well as the strong and robust, will seek passage on their cars, and provide suitable platforms or steps for that purpose. . . . The question, after all, was simply whether the failure of the defendant to have a suitable platform or other suitable and safe means for getting on the train was the cause of plaintiff's getting hurt in endeavoring to board the train; and, even if it was, whether plaintiff by her own fault or negligence did not contribute directly to this result. The facts were few and simple, and the question of defendant's negligence and plaintiff's contributory negligence were properly submitted to the jury." This case is also strikingly similar in its essential facts to that of Fillingham v. Railroad, 102 Mo. App. 573. In that case, as in this, the defendant insisted that the plaintiff was guilty of con-

tributory negligence in stepping down at the spot
which she knew was dangerous instead of going to the
rear of the car, which, it was said, was opposite a level
piece of ground.    The evidence was conflicting as to
the nature of the ground at this place.    The Court of
Appeals, after stating the facts, said: "What is certain
is that passengers were permitted to alight from any
portion of the footboard, and that plaintiff was per-
mitted to do so without remonstrance. . . . It has
already been shown that plaintiff did not fully realize
the length of the step she had to take, or knew pre-
cisely what sort of ground she would have to step on.
While she said the distance was three or four feet,
other witnesses said it was only about twenty-two
inches.    To hold that she was negligent as a matter
of law in getting off there, would be to lose sight of
the high care the car men were bound to take of her.
She really got off where she did at their invitation.
The car was so constructed that passengers could alight
from it at either side by stepping on the running-board
and from it to the ground; and it was expected that
they would alight in that manner.    Stopping, calling
out the station and watching as she moved to leave
the car, all of which acts the conductor did, certainly
amounted to an invitation for her to leave it where it
stood."    Certainly the defendant in this case got the
full benefit of the law on this point by the instruction
number five given at its request as follows:    "The
court instructs the jury that it was not the duty of
the defendant or any of its train crew to assist the
plaintiff in alighting from the car in which she was
transported from St. Louis to Lindenwood on the
20th day of November, 1903, unless she requested or
advised them or some of them that she desired or
needed such assistance and the evidence does not show
or tend to show that she either requested any such
assistance or advised anyone that she needed it." And

by the third instruction for the defendant, the jury were told "that if the plaintiff was injured while attempting to alight from the said train, if they should further find that her injuries were caused by her own carelessness and the lack of ordinary care in attempting to alight at a place and under circumstances where it was dangerous for her to make the attempt, then she could not recover."

We think that the question of plaintiff's contributory negligence, under all the facts developed in this case, was a question for the jury, and that the court properly refused the demurrer to the evidence on that ground.

II.   It is next insisted by the defendant that it was required to exercise only ordinary care as to its platform and station grounds.   It assails the first instruction given by the court in behalf of the plaintiff in that it told the jury that, "The defendant owed the plaintiff the duty of exercising that high degree of care which a very cautious and prudent person similarly situated would exercise for her own safety, including the matter of providing her with a safe means of egress from its train at the point of her destination, and the failure of the defendant to exercise such degree of care would constitute negligence," and, "If from the evidence they believe that the plaintiff, on November 20, 1903, was a passenger upon one of defendant's trains, and that her destination was Lindenwood Station, and that at Lindenwood Station the defendant stopped its train for the purpose of allowing plaintiff to disembark and plaintiff in the exercise of ordinary care, that is, such care as an ordinarily prudent person similarly situated would exercise in her attempt to disembark from said train, was injured by reason of stepping into or falling into a hole or excavation that existed there, if they found such excavation or hole existing, and that the de-

fendant was guilty of negligence in permitting such hole or excavation, if any there was, to be there, *and in stopping its train and inviting plaintiff to alight there, if they found such was the fact,* and that as the direct and immediate result thereof, the plaintiff sustained the injury, then their verdict should be for the plaintiff.'' The contention is that the defendant was bound to exercise only ordinary care with respect to its station grounds and platforms, and that this rule is clearly recognized in the case of Robertson v. Railroad, 152 Mo. 382. The learned counsel seeks to limit this instruction to the condition of the defendant's station grounds and to the degree of care which a carrier must exercise with respect to station grounds and platforms when used by persons after the relation of carrier and passenger has ceased or before it has begun. Whereas the gist of the instruction is directed to the defendant's negligence in stopping its train at an unsafe place and inviting plaintiff to alight there. The whole instruction must be read and considered together, and when so read, it announced the degree of care which the defendant was bound to exercise towards the plaintiff as a passenger. The rule is tersely stated in Fillingham v. Railroad, 102 Mo. App. l. c. 581, by Judge GOODE, wherein he says: ''The next point to be examined is as to whether the contract for carriage was in force while plaintiff was leaving the car, or had previously terminated. In other words, when does such a contract end? This is a material question in determining the degree of care the defendant owed the plaintiff. It may be easily answered. The contract between a passenger and carrier continues not only during the interval of time consumed in transporting the passenger from his starting point to destination, but during the period needed for a safe exit from the vehicle. The degree of care re-

quired of the carrier for a passenger's safety while he is leaving the vehicle is as high as that required while he is in transit; that is to say, the extraordinary care imposed by law on carriers of passengers begins when the contract of carriage takes effect on the rights of the parties and continues unimpaired until the contract ends with deposit at destination, thus protecting passengers as they get on and off conveyances. Part of this duty to safeguard passengers while leaving a car or other vehicle consists *in taking care to put them off at a reasonably safe place.* This rule is to be distinguished from the one holding a carrier only for lack of ordinary diligence in respect to platforms and approaches, in actions for injuries resulting before the relation of carrier and passenger began, or after it ended.'' [Cobb v. Railroad, 149 Mo. l. c. 150; Kelly v. Railroad, 112 N. Y. 443.] In Cobb v. Railroad, 149 Mo. l. c. 150, it was said by this court: ''The case of Kelly v. Railroad, 112 N. Y. 443, cited in support of the proposition that the very high degree of care demanded by the carrier does not attach to every incident of its business, does not reach the question of the care required of the conductor in guarding the safety of passengers while on *or in the act of alighting from his train.* There the plaintiff had been a passenger but had alighted in safety, and as he was leaving, fell on the sidewalk because it was slippery. The court held that in furnishing approaches to its cars, such as platforms, halls, stairways and the like, the carrier is required to exercise only ordinary care.'' ''Common carriers are not, of course, insurers of the safety of those they convey, nor answerable for an accident to them no matter how produced; but only for those accidents which can be traced to some neglect of duty. In every such case the question is one of negligence, which must appear either from the testimony or the nature

of the accident. Hence, if an injury happens to a passenger in getting off of a vehicle at a difficult landing place, and is caused thereby, the carrier's responsibility depends on whether it was negligent in discharging the passenger at the place.'' [Fillingham v. Railroad, supra.] In Robertson v. Railroad, 152 Mo. 382, we had before us in judgment a case of a young lady injured by reason of a defective platform as she approached the train to become a passenger, and what was said there was in no manner intended to conflict with what was said in Cobb v. Railroad, 149 Mo. l. c. 150. We think the two cases are entirely harmonious and that the distinction drawn by the St. Louis Court of Appeals in Fillingham v. Railroad, supra, was a correct statement of the law.

The instruction complained of did not hold the defendant to the high degree of care required for a passenger as to the condition of its depot grounds, but did hold it, and properly so, for that high degree of care in inviting the plaintiff to alight at an unsafe place in the dark. We think the instruction fairly and correctly presented the law as to the duty of the defendant, and that there was no error in giving it.

III. Error is predicated upon the refusal of the court to exclude the testimony of Mrs. Quin as to the effect of the injury upon her lower limbs. The evidence on this point was as follows: ''Q. How about your lower limbs? Ans. It is this left limb that is giving out completely, so I fell several times trying to get up. Q. Are you able to walk without assistance or to go about? Ans. No, sir.'' No objection was made to these questions and answers at the time they were propounded and answered, but soon after these replies were given, counsel for the defendant stated to the court that his attention had just been called to the fact that there was no allegation in the

petition concerning injury to plaintiff's leg, and moved the court to strike out this evidence. The allegation of the petition was that the entire nervous system was shocked and impaired by the injury, and Doctor Farrell testified that the apparent little use of the plaintiff's left limb was an objective symptom of plaintiff's injury, and Doctor Hoge testified that the objective symptoms that he found were the plaintiff's injuries to her spine and nervous system with weakness in both limbs. The testimony of the plaintiff was not that her left leg had been injured in the fall, but simply that it was giving out completely, and that she had fallen several times in trying to get about, which symptoms the physicians testified were an indication of the injury to her spine and nervous system, in other words, was the result of injuries to her spine and head of which she complained in her petition. While it is true that where the petition alleges specific injuries, other injuries should not be permitted in evidence, we do not think this evidence conflicts with that rule, as the weakness of her lower limbs was the result of the injury specifically described in the petition. We think the court committed no error in refusing to strike out this testimony.

IV. It is next urged that the court erred in permitting the plaintiff to introduce opinion evidence as to the health and physical condition of the plaintiff by non-expert witnesses. As to this point, Mrs. Chambers testified that the plaintiff had lived at her house since the accident. She was asked, what is her physical condition, and she answered, "I should say it was very poor." Mrs. Brown said she had known the plaintiff a long time and had seen her three times since she claimed to have been injured. She was asked what was her condition then. This was objected to as incompetent and immaterial and the competency of the witness had not been shown. She answered that

she was not able to be around personally to work. The defendant moved to strike out this answer as not responsive and because the witness was not an expert. She was then asked if she was able to attend to her household duties as she previously had been, and this was objected to, and she answered that she had not been able to do anything. She was asked, "What did you observe the trouble was with her?" and she answered that she thought paralysis or something of that kind might result. "I mean to do the best I can to tell you, but she was very feeble." No express ruling was made on these objections and this motion against the testimony of Mrs. Brown, and there was no express exception taken to the action of the court. In State v. David, 131 Mo. l. c. 394, 395, the witness was asked, What seemed to be the matter with Henderson? and that question was objected to and assigned as error, and it was said by this court, "It is perfectly competent for him to state the evidences of suffering and pain that he observed. He had already testified that the deceased was stooped over with cramps, and was holding to the bedrail as if in extreme agony; that he had brought him hot coffee; that he could not drink it, and was asked, 'What seemed to be the trouble?' and he answered merely that 'he seemed like he couldn't raise himself up far enough to swallow, looked like his nerves and everything was strained.' 'He could not swallow.' " Now in this case, Mrs. Chambers had been living in the same house with the plaintiff since the latter part of November preceding the trial of this case, which was almost a year, and had seen her every day during that time, and that she had been there before breakfast and at bed time, and, except on two or three occasions, had never seen plaintiff out of her chair. In Reid v. Insurance Co., 58 Mo. 421, a physician who had treated Reid was asked whether or not, at the time of mak-

ing an application for insurance, Reid was in good health and free from any symptoms of disease, and it was held that this question involved a mere conclusion, that the facts should have been stated in order that it might have been seen on what the opinion was predicated, but in this case, Mrs. Chambers having lived in the house for nearly a year with the plaintiff, with an opportunity daily to observe her condition, was competent to state the condition of apparent health of the plaintiff.

In Railroad v. McLendon, 63 Ala. 275, 276, a non-expert witness testified that "the plaintiff seemed to be suffering during the time she stayed at Mrs. Griffin's. . . . She was not able to use her arm a large part of the time for several months after she fell from the mare at the bridge. . . . The left wrist of plaintiff looked like the bone had slipped off the joint. . . She looked bad." In considering the objection to this non-expert testimony, the court said: "All these are but facts, or, at most, conclusions of fact; awkwardly expressed sometimes, it is true; still, we find in them nothing to which a witness may not testify." And the court quoted with approval Wharton on Evidence (3 Ed.), volume 1, section 510, in which the author says: "The true line of distinction is this: an inference necessarily involving certain facts may be stated without the facts, the inference being an equivalent to a specification of the facts. . . . In other words, when the opinion is mere short-hand rendering of the facts, then the opinion can be given, subject to cross-examination as to the facts on which it is based." In Railroad v. Cassell, 66 Md. l. c. 432, the court said: "If ordinary individuals could not judge of a person's health from his appearance and symptoms, it would be impossible to know when it was necessary to call in a physician. If a man received a blow from a heavy bludgeon on his lower limbs, certainly an unlearned

person, who observed the occurrence, could testify that after the infliction of the blow his appearance was that of a crippled man, but not before." In 17 Cyc. 87, and following, the authorities are collected at great length to sustain the text to the effect that a witness may state the apparent physical condition of a man, or of cattle, horses or other animals, or as to what are more distinctly inferences of animal bodily phenomena as the existence of a state of apparent health, or on the other hand, the existence of a state of apparent sickness or disease. Certainly the opportunities of Mrs. Chambers to observe the plaintiff were a sufficient basis for her testimony that she would say that her physical condition was very poor. As to Mrs. Brown's testimony, there was no exception to this testimony when offered and of course it is not reviewable here.

V. Defendant complains of the refusal of its second instruction, which in substance was that if, on the morning of November 20, 1903, the surface of the ground at and in front of defendant's station was in a rough, uneven and dangerous condition and *such condition was apparent* and known to plaintiff, when she was there in the morning and when the train stopped there that evening, and plaintiff went out of the front door to alight, and when she reached the platform it was so dark she could not see where the train was standing or whether it was safe or dangerous to alight there and with such knowledge attempted to alight and without making any effort to secure the assistance of any member of the train crew or other person and was injured in stepping down, then as a matter of law, she could not recover. There are a number of reasons why no error was committed in refusing this instruction. The question of plaintiff's contributory negligence was fully presented to the jury in plaintiff's first instruction, which required as a condition

precedent to plaintiff's recovery, that she must have exercised ordinary care in alighting from the train, that is, such care as an ordinarily prudent person, similarly situated, would have exercised in her attempt to alight from the train, and in defendant's third instruction, which told the jury that if plaintiff's injuries were caused by her own carelessness and lack of ordinary care in alighting at a place and under circumstances where it was dangerous for her to make the attempt, she could not recover, and defendant's fourth instruction, which advised the jury that if when plaintiff arrived at Lindenwood that evening there were two ways open and apparent to her, to alight from the train, one a safe way, the other dangerous, and she knowingly selected the dangerous way and was hurt, she could not recover. But the instruction was faulty in that it submitted to the jury whether the dangerous, rough and uneven condition of the station ground was not known and apparent to plaintiff that morning. There was no evidence that she knew or saw the condition of the ground that morning, and what is more material, that she knew that night, in the darkness, that the train had stopped at an unsafe place for her to alight.

VI. The refusal of the defendant's twelfth instruction is also urged as error. This instruction told the jury that if plaintiff went out of the car that night at the front end, and when she opened the door found the place was dark and no brakeman present to assist her in alighting and with such knowledge attempted to alight and was injured, and such injury would not have occurred if the place had been lighted, and there had been a brakeman present to assist her, then she could not recover. This instruction was inconsistent with defendant's instruction numbered 5, which told the jury that it was not the duty of the defendant or its trainmen to assist plaintiff in alighting unless

she had requested such assistance and she had not. The two would have been contradictory. But it was not the law. The plaintiff was a passenger. She did not know the place was dangerous and could not see that it was, but having been invited by defendant to alight there, she had the right to presume that, with the exercise of ordinary care, she could alight, and there was no evidence that she did not observe ordinary care in attempting to safely get off the car. Having produced the conditions and knowing its own grounds and not having provided a platform for plaintiff to alight upon, and having invited plaintiff to get off of its car at this place, defendant cannot be heard to complain that plaintiff relied upon the presumption that it had observed its duty in providing her a reasonably safe place of exit from its train. The instruction was tantamount to a demurrer to the evidence, an instruction that, as a matter of law, plaintiff was guilty of such contributory negligence that she could not recover. We think it was properly refused. Whether plaintiff in all the circumstances surrounding her exercised ordinary care for her own safety, in alighting, was a question for the jury and was properly submitted in the other instructions already noticed.

VII. Finally, it seems to be the contention that plaintiff was not injured but was simulating, and that Dr. Floyd's evidence establishes that she was not hurt as her evidence tended to show she was. We think this was an issue for the jury. There was sufficient testimony, if believed by the jury, and it evidently must have been, to justify the jury in finding she was seriously injured. The jury saw and heard the witnesses testify. It was peculiarly their duty to weigh the credibility of the witnesses. The circuit court also had this advantage and it approved the verdict. The evidence was all oral. There is nothing which would

justify this court in saying the verdict was the result of passion or prejudice or that it was without substantial evidence to support it. As in our opinion the cause was submitted upon proper instructions and there was substantial evidence to support it, and no reversible error otherwise appearing, the judgment must be and is affirmed.

*Fox, P. J.,* and *Burgess, J.,* concur.